is Lash v. Sparta Community Hospital. I think the key place to begin on this appeal is the actual statutory language, which is set forth on page 31 of our appellant's brief. In the two provisions, I want to direct the court's attention to our subsection C, which or physical illness, then subsection D has the language about no exoneration related to any treatment prescribed for mental or physical illness or addiction. And what I think is important in those sections, and it is in the briefing, but I want to highlight this, is neither of those sections states that a diagnosis is required to be within those exceptions. So, in other words, if the doctor or the hospital, they know about a condition and they purport to treat that condition, it does not matter if they call that condition a diagnosis, a finding, bog, what have you. I'm lost now. Maybe you could help me. It sounds like you're now arguing based on what the physician, Dr. Matwani, did. But the claim against him has been settled, so that's not a basis of liability. The only remaining basis of liability would be the actions of the nurses, and that's what we need to focus on. Correct. And I agree with that. And that leads to my second point. Okay, so given that that's a statutory language, did the hospital begin to treat the enlarged right highline? And I would say it was not just Dr. Matwani, certainly I think he was treating it, but I think the hospital was part of that treatment. And the reason I say that, the hospital was part of the treatment, too, as you look to the discharge instructions. And those are written by the nurse, by the hospital, and they tell them. Could you articulate in what way you believe one or more of the nurses was negligent, in a way that's distinct from any liability of Dr. Matwani? Certainly. And I think I lay out all of the opinions of our nursing experts at our rentals, but I'll focus on a couple of them. The first thing that she talks about is she says they should have advocated to not discharge the patient, given the findings that were made, and known to the hospital. The second thing... Is that a... Let's just take that. Yeah. Is that a potential source of liability under state law? Is a nurse obliged, as a matter of state tort law, to argue with the attending physician, to remonstrate with him? I would say, yes, and here's what I want to add. Okay. So what do you rely on for that proposition? Because the hospital says there's no such duty. I did not... I'll be candid. I did not pick up that that was one of the hospital's bases for summary judgment at any point. Tell me what you rely on for the proposition that nurses are liable or can be liable for failing to argue with the attending physician, to try to talk him out of his conclusion. And to be candid, I did not take that to be their position of law that they were taking. Our nurse expressed those opinions. Their motion did not purport to strike those opinions, stating that it's contrary to law. Look, if the answer to my question is, I didn't research that, that's fine. But you're filibustering rather than dealing with my question. I did not research that question. I do not believe that question was raised. All right. So that's example number one. How about example number two? Example number two that leaps to mind is, she said, they did not provide instructions to Mr. Lash on what the right high law enlargement is, in other words, its potential significance. So what in state law requires nurses, rather than physicians, to provide that information? I believe the statute on informed consent, and let me see if I have that right in front of you. It does not make a distinction. So in other words... That's your problem. The physician makes a diagnosis, which appears to be completely wrong, and the claim against the physician is settled. You have to have some claim against the nurses that's distinct from the claim against the physician. And if state law just says the hospital, as a unit, has to provide this, your difficulty is that you end up contending the nurses have to sandbag the physician or contradict him. Because the physician's advice is out of the case. The statute, I would disagree. And the reason I disagree is, for example... I'm not really worried about whether you disagree. You represent the plaintiff. You have to disagree. Right. I'm trying to answer. I'm worried about what state law is. That's why I've phrased my questions, where do we go in state law to find the proposition that is behind your contentions about what the nurses did wrong? That's where we need to be. Right. And I'm trying to answer that. I would say the statute, 410 ILCS 50-3a, just discusses the right of each patient to receive information concerning his or her condition and proposed treatment. All right. So is there some state case which says, if the physician gives bad information to the nurse, the nurse must give correct information to the patient? I am not aware of any case that makes that statement. Have you done any research about that? That's where you need to go in order to prevail in this case. I would disagree with that second statement. And the reason I would disagree with that is because that was not a basis for the motion for summary judgment. And the case law from this court is very clear that new arguments and replies cannot serve as a basis for summary judgment. So an argument that was never made in the motion for summary judgment or the reply or even in the magistrate judge's order granting summary judgment, I do not think that can serve as the basis for summary judgment. At the least— But was there anything in your complaint that would put them on notice that that was your claim? About informed consent or about the nurses in general? Or nurses' separate liability along—for not following what the doctor—or not challenging the doctor's—the two points. I didn't see anything in your complaint that talked about the nurses' separate liability based on their actions that would have put the other side on notice that they needed to move for summary judgment. I would go to two things. I think the allegations in the complaint did have allegations specific that talked about what the nurses and doctors did, but then I think from their own records they know— I didn't even see the word nurse in the complaint. I agree with that. It said employees— The complaint was about the doctors and the hospitals and the hospital liability. Correct. The hospital liability for the acts of its employees, agents, officers, or representatives. And then the expert's report did discuss how the RN was—I forget his verbiage, but something to the effect of ridiculous or uncalled for for reassuring the patient. He mentions that a few times. The expert's report also talks about Dr. Motwani and the caregivers, and I think at another point Dr. Motwani and the staff at the hospital. So I think at the very least, the expert's report put them on notice that the conduct of their nurses was at issue. Under Illinois law, can a nurse or a doctor administer treatment without rendering a diagnosis? I believe that—I know the answer should be yes or no. Here's what I think. I think they have to have made the condition known. I don't know if they have to write the word diagnosis before they render a treatment, but if, for example, they know there's right hilar enlargement, even if they call that a finding or something, I believe they can administer treatment. I don't know if they have to use that specific verbiage before they can render the treatment.  I think for what Dr. Motwani was doing for treatment, what the hospital was doing for treatment, where it amounted to, go see your primary care physician in another week. I don't think they necessarily need that verbiage. Now maybe the instance, if they were prescribing medicine for the right hilar enlargement or they were doing something more aggressive, then I think maybe they actually have to use the word diagnosis. But I think the treatment they provided, which was basically tell the patient to go see his physician in a week or so, I don't know if they actually have to have the word diagnosis involved. I believe I have 30 seconds left, if I can use that for a quick rebuttal. Thank you. All right. All right. I apologize. Mr. Duckels. Yes, may it please the court, counsel. I did want to note that trial counsel Ed Bott, we had indicated that he would be here today. He woke up this morning with flu-like and cold-like symptoms and did not have an adequate time to get a COVID test. So he will not be here today. But since we had indicated he would be, I wanted to explain why he is not. I'm sorry. You are going to have to both slow down and raise your voice to make yourself... No, don't touch the microphone. That records. This is a very big room. You need to make yourself heard. Understood. I can move on past my explanation about Mr. Bott's absence. I guess I did have some prepared remarks, but Judge Easterbrook, you jumped right to it. Initially, what I was going to start with was to have a discussion about, regardless of what was briefed during summary judgment, actions that occurred in the trial court after summary judgment, notably Dr. Panico and Dr. Mantuani being removed from the case via different mechanisms, one through settlement and one through an unappealed summary judgment motion. Dr. Panico's failure greatly reduces the issues that we have in this appeal, specifically to the nursing issues. If you don't mind, I wouldn't mind addressing some of the questions that you asked opposing counsel as perhaps an answer for me would be helpful to the court as well. I believe these are not sequential. I believe one of the questions was, is there anything in Illinois law that would require a nurse to disagree with a physician's diagnosis and inform a patient to that effect or be at risk of breaching the duty that applies to the nursing standard of care? I have been doing medical malpractice for quite some time. I have never seen that in a case ever. I have never seen a case in Illinois that says that that is a breach of a standard of care to disagree with a patient's thought. Well, I do have much the same question, though, that I asked Mr. Blanco. Is your not having seen it a fact that you researched it and it's not there, or you just never had occasion to look for it? I'd have to think back quite a while to see if I'd ever researched it. I know that I did not research it for this particular argument, and I also do know that based on the way that standard of care is addressed in Illinois state courts, that physicians deal with physician's standard of care issues. Nurses deal with nursing's standard of care issues, and Nurse Reynolds' opinions don't ever explicitly say that she believes that a nurse in this case breached the standard of care by going against what Dr. Matwani found the diagnosis to be and recommended the treatment for the diagnosis to be, or what he found the diagnosis to not be. So ultimately, at the end of the day, whether it may be recognized in a case somewhere that I'm not familiar with, it is not a part of this particular case, because it is not part of Nurse Reynolds' opinions in this case, which is what we are bound to consider at this point, particularly considering that there were no allegations of nursing malpractice or breaching the standard of care contained anywhere in the complaint. All we are left with is to sift through the expert witness report of Nurse Reynolds. I would also note the plaintiff's expert, Dr. Osborne, agreed during his deposition that nurses do not issue the diagnosis, they do not make the diagnosis, they do not issue the diagnosis. That is for Dr. Matwani, as the ER physician in this particular case, to do. The source of that statement was, I apologize? It was from Dr. Osborne, who is one of the plaintiffs. But is it from state law? No. I wouldn't have any difficulty imagining a state having a rule that says that a nurse, if the nurse sees a doctor making a bad decision, the nurse has to speak up. That's, for example, the co-pilot's duty in an airplane. The co-pilot must speak up, rather than let the pilot make a mistake. And if state law said that, then state law would say that. We really just need to know whether state law does say that. And, I don't have an answer in addition to what I've already said, which is that I really don't, I can't tell you that I comprehensively know the answer to that. I believe, based on my experience, that that is not what Illinois law says. And finally, that it is not part of what Nurse Reynolds' opinions are in this case, in any event. There was a statement made by opposing counsel that some of these issues, with regard to on appeal to the nursing care issues, were not raised in the motion for summary judgment. Well, that's because the triggering events that led to the change in the scope of this case occurred after the summary judgment briefing was already complete. Opposing counsel also mentioned Nurse Reynolds' opinions, which I am going to get to here in my waning time. He mentioned something about the Wright-Heiler enlargement. Nurse Reynolds has seven opinions in this case that she has stated in her expert witness report. I have them with me, and I have them verbatim, and none of them reference the Wright-Heiler enlargement in any event. It is not stated as part of her opinions in this case, which again, this is all that I of a nursing standard of care is in the complaint. There was reference by opposing counsel to the expert report, which was also by a physician. The report that came along with the complaint sort of taking some negative statements, very vaguely and generally, about what the nurses did. But again, that is under Illinois law, under the Illinois Supreme Court case in Sullivan, that is for a nurse to opine on and not a physician. And then I believe the last thing that I have here in my notes was a question as can treatment be rendered without a diagnosis under Illinois law? I don't know the answer to that. In the medical community, I don't know the answer to that. But what I do know is that a diagnosis being rendered inaccurately or not being rendered at all is of critical importance when you take a medical malpractice case and put it into the context of the Tort Immunity Act in Illinois. That is where, regardless of what may apply to a private hospital or a private practitioner and physician, it certainly is of utmost importance in analyzing the application of the Tort Immunity Act in the state of Illinois. Now, I did want to then, if I can get through them in three minutes, I will try. The opinions from Nurse Reynolds' report. Even if we were to assume that they had been pled, even if we were to... Was that report attached to the complaint or just something produced during discovery? It was, yes. She submitted it during discovery. During discovery. Yes. And I believe it is in the record. Yes. Yeah. But it wasn't like the doctors attached to the complaint, so the focus of what the case was. Correct. That is correct. That is correct. I divided these into two buckets, and the purpose that I was going to go through them is even if you assume that they are in the case, they still, ultimately, would not survive the analysis under the Tort Immunity Act because they ultimately all go to the fair to diagnose and the fair to treat or the inadequate investigation, and we've cited cases throughout our brief where this issue has come up. These issues have all come up before, and they've all been resolved by Illinois state courts. First, failure to obtain medical history of heart and lung. Under the Mabry case that we cited, the allegation that a defendant in the emergency room did not take a proper history is barred under the Tort Immunity Act because it goes to diagnosis and investigation. Then there were three that go to Judge Easterbrook's question, which related to, in a sense, what a nurse is required to do in confronting a physician with additional information. Quote, failure to effectively identify and communicate abnormal diagnostic studies to a physician, which failure to effectively communicate to the physician concerns of medical history consistent with acute coronary syndrome, and failure to communicate concerns of premature discharge related to an abnormal nursing assessment and results of medical tests with the physicians and nursing leadership. That one is quite a mouthful. But under the Illinois Supreme Court case in Michigan Avenue, a nurse's failure to consult with and discuss issues with a physician also goes to failure to investigate and to diagnose and is barred under the Tort Immunity Act. The last under, it essentially created two buckets. There was the failure to warn, or not failure to warn, failure to diagnose and failure to investigate. This was the fifth of the seven opinions that falls under that. Failure to advocate for patient, it's nebulous. I don't really know what the advocacy would relate to, but the one thing that we do know that it does not relate to is the diagnosis that was rendered, because Nurse Reynolds has agreed on her oath and her deposition, what the nurses in this case did, with regard to the rendered diagnosis completely conformed with the standard of care. The last two would be opinions that would go to, under the second bucket, which would be the failure to present information to Mr. Lash himself. I'm not going to read them because, again, they are a little bit lengthy and I'm running out of time. But we have cited to Michigan Avenue, the Illinois Supreme Court case again, which said that a claim that a defendant, quote, should have explained to Collins, that's the patient, that there was a problem with her breast. She ultimately did pass from breast cancer when it was diagnosed as a cystic mass instead. And that the failure to relay this to the patient and that the further evaluation that  Thank you, Mr. Dunkels. ...seek further... I see that my time is up. Did you have any questions for me at all? Thank you very much for your time today. Mr. Boyk-Vogel, we'll give you an entire minute. Oh, thank you. Very quickly, Ms. Reynolds did, in fact, cite the Illinois Nurses Practice Act if you're looking for a source of the nurse's duty, and that's quoted on page 12 of the appellant's brief. They asked her about the right pilar enlargement in her deposition. That testimony is in the record and it is in the briefing. As far as the experts report, they are correct. A doctor can't opine on a nurse's standard of care, but what section 622 requires is a physician to basically do a certificate of merit. I must say, the stuff you've cited, quoted at page 12, is complete fog. It doesn't seem to set out any concrete duty at all, let alone a duty to tell the doctor he's making a mistake or contradict him to a patient. I don't believe Ms. Reynolds was ever saying she was supposed to contradict a doctor or overrule the doctor. Her testimony was they should have at least told the doctor, I do not think this is a good idea. And what in state law requires that? Shrugging your shoulders doesn't really do it. I understand that. She is citing the Illinois Nurses Practice Act and you're saying those prescriptions in that act are vague. I would agree. Things can be made less vague, for example, by a decision of a court. So if there's some court that makes them less vague in a way helpful to your client. You know, in diversity cases, we are sometimes referred to as ventriloquist dummies because we're supposed to mimic what the state court is doing. But even Mortimer Snurd had some information from Edgar Bergen, right, had knowledge in which to play the role of dummy. Otherwise we're just dummy dummies. We need to know about state law. And what I would say on that point, I appreciate what you're stating, is that they were the movement and if they had cited case law saying the nurse has none of these duties that Ms. Reynolds says they do, then they would at least put me on the burn to respond to that. No, you're the plaintiff. The plaintiff has the burden of both production and persuasion at all stages in the litigation. Here we are. Okay, thank you very much. The case is taken under advisement and the court will be in recess.